# UNITED STATES DISTRICT COURT
# NORTHERN DISTRICT OF INDIANA
# HAMMOND DIVISION AT LAFAYETTE

EROL A. CETINOK,
        Plaintiff,

v.                                       CAUSE NO.: 4:16-CV-34-TLS

ACELL, INC.,
        Defendant.

## OPINION AND ORDER

This mater is before the Court on the Defendant's Motion for Summary Judgment [ECF No. 62], filed on October 25, 2019. In pertinent part, the Defendant argues that it is entitled to summary judgment because it fired the Plaintiff for his poor work performance rather than his religious beliefs. For the reasons stated below, the Defendant's Motion for Summary Judgment is DENIED.

## STATEMENT OF MATERIAL FACTS

The Defendant is a company that manufactures medical devices. *See* Decl. of Barry Brainard ¶ 4, ECF No. 64-5. On April 24, 2015, the Defendant hired the Plaintiff as an engineer for one of its facilities. *Id.* ¶ 11. The Plaintiff's first day of work was on May 4, 2015. *Id.* During the relatively short period of his employment, the Plaintiff was supervised by Scott Campanella and Barry Brainard. *Id.*

On May 5, 2015, the Plaintiff went to lunch at a Chinese restaurant with Campanella and Brainard. *See* Cetinok Dep. p. 24, ECF No. 65-1.[1] The Plaintiff asked a waitress what meat was used in the restaurant's egg rolls and soup, and she responded that both products contained pork. *Id.* The Plaintiff responded that he did not eat pork and asked for a substitution. *Id.* At that point,

---

[1] For convenience, the Court will cite to the CM/ECF electronic page header rather than the page number listed on the deposition transcript.

Brainard asked the Plaintiff "why don't you eat pork? Is it religious?" *Id.* The Plaintiff responded that he does not eat pork because of his religious beliefs. *Id.* In response, Brainard asked "are you Jewish?" *Id.* The Plaintiff responded that "I am not Jewish. I happen to be Muslim." *Id.* Following this exchange, the Plaintiff "sat there in silence," and it was the "[e]nd of conversation by either one of them for the rest of the meal." *Id.*

On May 8, 2015, the Plaintiff talked with Brainard about an assignment. *Id.* at 35. During the conversation, the Plaintiff noticed that Brainard had some sort of a tattoo on his arm. *Id.* at 36. In an attempt to bond with his boss, the Plaintiff rolled up his sleeve and revealed his army tattoo. *Id.* The Plaintiff stated that his tattoo and military service were "very important" to him. *Id.* The Plaintiff stated that Brainard "then rolled up his sleeve, and it was a cross with a chain around it and a placard underneath that said, 'John 3:16.'" *Id.* The Plaintiff testified that Brainard stated that "[t]his is very important to me as well." *Id.* Brainard then asked the Plaintiff the following question: "So you don't accept Jesus as your Lord and Savior?" *Id.* The Plaintiff answered that in the Islamic faith, Jesus is "not the Lord and Savior. He's more of a messenger from God." *Id.* The Plaintiff stated that Muslims "believe in a lot of things that the New Testament says about him, including his birth from—with Mary, his ability to, you know, do miracles, feed with one fish, walk on water, travel the entire Earth in a day." *Id.* In response, Brainard stated that "I don't see how you could say he did all these miracles and was this man that was born the way he was born and this person cannot be the son of God, that Jesus cannot be the son of God." *Id.* Brainard also said that "[t]here just seems to be too many irreconcilable differences between your belief and ours." *Id.* The Plaintiff testified that Brainard's tone "was adversarial, especially his last comment . . . . That was a strong tone when he said that. It wasn't just a pleasant, you know, asking about it. It was adversarial." *Id.* at 37.

2

On May 17, 2015, Brainard sent an email "to Senior Human Resources Manager Eileen Smith and ACell Recruiter Tracie Hoy. The email expressed [his] concerns about [the Plaintiff's] performance, and requested that [they and Campanella] should get together to discuss what to do about [the Plaintiff's] poor performance and work ethic." Decl. of Scott Campanella ¶ 26, ECF No. 64-4.

On May 18, 2015, "the decision was made to terminate [the Plaintiff's] employment." *Id.* Both Brainard and Campanella stated that the Plaintiff was terminated because of "his poor performance, attendance and work ethic." *Id.* ¶ 27; Decl. of Barry Brainard ¶ 26. Brainard noted that the Plaintiff had left work early and arrived late, usually worked with his door closed, was observed texting on his cell phone, and failed to complete projects. Decl. of Barry Brainard ¶¶ 12–25. Campanella echoed these concerns and noted that the Plaintiff was late when completing his mandatory drug screening. Decl. of Scott Campanella ¶¶ 7–25.

Brainard stated that he did "not remember a discussion about the content of an egg roll or [the Plaintiff's] religion. I did not exclude [the Plaintiff] from the conversation or intentionally physically move away from him at any time during lunch." Decl. of Barry Brainard ¶¶ 28–29. Campanella repeated these statements regarding the discussion about the egg roll and the lunch conversation. Decl. of Scott Campanella ¶¶ 28–29. Brainard confirmed that he has "a tattoo on [his] upper right arm. The tattoo depicts a wooden cross with the phrase 'John 3:16' below the cross." Decl. of Barry Brainard ¶ 30. Brainard also confirmed that the Plaintiff "initiated a conversation about my tattoo after he told me he saw the edge of it under my sleeve. [The Plaintiff] then rolled up his sleeve to show his tattoo to me . . . and then asked me about my tattoo." *Id.* ¶ 31. Brainard stated that he then "showed him my tattoo and told him it was important to me because it was a symbol of my Christian faith." *Id.* ¶ 32. However, Brainard

3

emphasized that he "did not discuss the differences in religions with [the Plaintiff] during this discussion, and I did not make a statement about [the Plaintiff] accepting Jesus as the son of God." *Id.* ¶ 33.

Plaintiff testified that he believes he was fired because of his religious background. Cetinok Dep. p. 41. The Plaintiff disputed that he left work early without permission and insisted that he "was working the schedule—I mean, I was working what I needed to work at the time I was there." *Id.* at 38–39. The Plaintiff stated that he tried to take a drug test prior to starting his employment but the Defendant "gave him the wrong form" and the testing agency "could not perform the test without the right authorization to do so . . . ." *Id.* at 20. The Plaintiff stated that he informed the Defendant's human resources department of this situation and they told him they would "get it straightened out" and it would "not affect [him] moving forward or anything." *Id.* at 21. The Plaintiff stated that he "never heard anything again" about the drug testing until his first week of work. *Id.* The Plaintiff also stated that he "was not being antisocial" when he closed his door; rather, he closed his door because "it was loud outside." *Id.* at 39. The Plaintiff also stated that he was never questioned about failing to complete tasks and that he never received a formal review regarding his job performance. *Id.* at 55–56. The Plaintiff also testified that his work product and intelligence were praised by other individuals within the company. *Id.* at 56.

## LEGAL STANDARD

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The Supreme Court has explained that "the burden on the moving party may be discharged by 'showing'—that is, pointing out to the district court—that there is an absence of evidence to support the nonmoving party's case." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323

(1986). "If the moving party has properly supported his motion, the burden shifts to the non-moving party to come forward with specific facts showing that there is a genuine issue for trial." *Spierer v. Rossman*, 798 F.3d 502, 507 (7th Cir. 2015). "To survive summary judgment, the nonmoving party must establish some genuine issue for trial such that a reasonable jury could return a verdict in [his] favor." *Gordon v. FedEx Freight, Inc.*, 674 F.3d 769, 772–73 (7th Cir. 2012). Within this context, the Court must construe all facts and reasonable inferences from those facts in the light most favorable to the nonmoving party. *Frakes v. Peoria Sch. Dist. No. 150*, 872 F.3d 545, 550 (7th Cir. 2017). However, the nonmoving party "is only entitled to the benefit of inferences supported by admissible evidence, not those 'supported by only speculation or conjecture.'" *Grant v. Trs. of Ind. Univ.*, 870 F.3d 562, 568 (7th Cir. 2017) (citing *Nichols v. Michigan City Plant Planning Dep't*, 755 F.3d 594, 599 (7th Cir. 2014)). Likewise, irrelevant or unnecessary factual disputes do not preclude the entry of summary judgment. *Carroll v. Lynch*, 698 F.3d 561, 564 (7th Cir. 2012) (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)).

## ANALYSIS

In pertinent part, the Defendant argues that it is entitled to summary judgment because it fired the Plaintiff for his poor work performance rather than his religious beliefs. The Court concludes that a reasonable jury could find that the Plaintiff was terminated due to his religious beliefs and that there are disputed issues of material fact. As such, the Defendant's request for summary judgment is denied.

"Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq.*, as amended, prohibits employment discrimination on the basis of race, color, religion, sex, or national origin." *Ricci v. DeStefano*, 557 U.S. 557, 577 (2009). "At the summary-judgment stage, the proper

question is 'whether the evidence would permit a reasonable factfinder to conclude that the plaintiff's race, ethnicity, sex, religion, or other proscribed factor caused the [plaintiff's] discharge or other adverse employment action.'" *Ferrill v. Oak Creek-Franklin Joint Sch. Dist.*, 860 F.3d 494, 499 (7th Cir. 2017) (quoting *Ortiz v. Werner Enters., Inc.*, 834 F.3d 760, 765 (7th Cir. 2016)) (alteration in original).

When the evidence is viewed in the light most favorable to the non-moving party, a reasonable factfinder could conclude that the Plaintiff was fired because of his religious beliefs. For example, during a lunch outing on May 5, 2015, Brainard asked the Plaintiff "why don't you eat pork? Is it religious?" Cetinok Dep. p. 24. The Plaintiff confirmed that he does not eat pork because of his religious beliefs. *Id.* Brainard then purportedly asked the Plaintiff whether he was Jewish, and the Plaintiff responded that he is "not Jewish. I happen to be Muslim." *Id.* And, after that comment, there was no conversation for the remainder of the lunch. Likewise, on May 8, 2015, after asked about his tattoo by the Plaintiff, Brainard revealed his tattoo of a cross and asked the Plaintiff whether he "accept[ed] Jesus as his Lord and Savior." *Id.* at 35. The Plaintiff explained that Jesus, in the Islamic faith, was a prophet who performed miracles rather than the "Lord and Savior." *Id.* at 36. In response, Brainard stated that "I don't see how you could say he did all these miracles and . . . this person cannot be the son of God, that Jesus cannot be the son of God." *Id.* Brainard also said that "[t]here just seems to be too many irreconcilable differences between your belief and ours." *Id.* The Plaintiff testified that Brainard's tone "was adversarial, especially his last comment . . . . It was adversarial." *Id.* at 37. Finally, on May 17, 2015, Brainard sent an email to human resources in which he requested a meeting to discuss his concerns about the Plaintiff's work performance and work ethic. Decl. of Scott Campanella ¶ 27. On May 18, 2015, the Defendant terminated the Plaintiff's employment. *Id.* Based upon

Brainard's alleged actions, a reasonable jury could find that the Plaintiff was terminated because of his religious beliefs.

To be clear, both Brainard and Campanella stated that they "do not remember a discussion about the content of an egg roll or [the Plaintiff's] religion." *Id.* ¶ 29; Decl. of Barry Brainard ¶ 28. Likewise, although Brainard concedes that he showed his tattoo to the Plaintiff, he asserts that he "did not discuss the differences in religions with [the Plaintiff] during this discussion, and I did not make a statement about [the Plaintiff] accepting Jesus as the son of God." Decl. of Barry Brainard ¶¶ 30–34. Further, notwithstanding the Plaintiff's testimony to the contrary, Brainard and Campanella both maintain that the Plaintiff was fired due to "his poor performance, attendance and work ethic." *Id.* ¶ 26; Decl. of Scott Campanella ¶ 27. Such key factual disputes underscore the necessity of a trial. Certainly, a reasonable jury could find Campanella and Brainard's version of events to be credible and rule in favor of the Defendant. Nevertheless, as indicated above, such matters must be resolved by a trial rather than a motion for summary judgment.

Trying to avoid this result, the Defendant argues that the Plaintiff's claim fails because he cannot make a prima facie case of religious discrimination under the *McDonnell Douglas* burden shifting framework. *See McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802–04 (1973). Under this framework, the plaintiff carries the initial burden of establishing a prima facie case of employment discrimination, which can be accomplished by setting forth evidence that (1) he is a member of a protected class, (2) his job performance met the employer's legitimate expectations, (3) he suffered an adverse employment action, and (4) another similarly situated individual who was not in the protected class was treated more favorably than the plaintiff. *McKinney v. Office of Sheriff of Whitley Cty.*, 866 F.3d 803, 807 (7th Cir. 2017) (quoting *Burks v. Wis. Dep't of*

*Transp.*, 464 F.3d 744, 750–51 (7th Cir. 2006)). If established, this prima facie case creates a presumption of discrimination, and the burden then shifts to the employer to articulate a legitimate, nondiscriminatory reason for its employment decision. *Id.* (quoting *McDonnell Douglas*, 411 U.S. at 802). If the employer does this, the burden shifts back to the plaintiff to produce evidence that the stated reason is a mere pretext. *Id.* (quoting *Coleman v. Donahoe*, 667 F.3d 835, 845 (7th Cir. 2012)). However, the *McDonell Douglas* burden shifting framework is not required for a plaintiff to survive summary judgment. Instead, the Seventh Circuit has concluded that the *McDonell Douglas* burden shifting framework is merely a method for a plaintiff to organize and present a claim of employment discrimination:

> As we have explained, both before and after *Ortiz*, *McDonnell Douglas* is a means of organizing, presenting, and assessing circumstantial evidence in frequently recurring factual patterns found in discrimination cases. *See, e.g.*, *Volling v. Kurtz Paramedic Servs., Inc.*, 840 F.3d 378, 383 (7th Cir. 2016) (observing that a "prima facie case in Title VII litigation . . . refers to a *common, but not exclusive*, method of establishing a triable issue of intentional discrimination" (emphasis added) (internal quotation marks omitted)); *Morgan v. SVT, LLC*, 724 F.3d 990, 997 (7th Cir. 2013) (explaining that "the original purpose of *McDonnell Douglas* . . . was to outline a series of steps that, if satisfied, would support a plaintiff's right to reach a trier of fact"). As *Ortiz* and our other case law make clear, however, *McDonnell Douglas* is not the only way to assess circumstantial evidence of discrimination. In adjudicating a summary judgment motion, the question remains: has the non-moving party produced sufficient evidence to support a jury verdict of intentional discrimination?

*David v. Bd. of Trs. of Cmty. Coll. Dist. No. 508*, 846 F.3d 216, 224 (7th Cir. 2017); *see McDaniel v. Progress Rail Locomotive, Inc.*, 940 F.3d 360, 367–68 (7th Cir. 2019); *Lewis v. Wilkie*, 909 F.3d 858, 866–67 (7th Cir. 2018); *see generally* Zachary J. Strongin, Note, *Fleeing the Rat's Nest: Title VII Jurisprudence After Ortiz v. Werner Enterprises, Inc.*, 83 Brook. L. Rev. 725 (2018). As noted above, the Court has already found that a reasonable jury could find that the Plaintiff was terminated because of his religious beliefs. As such, the Defendant's reliance

upon the *McDonell Douglas* burden shifting framework is not dispositive in this case. *See David*, 846 F.3d at 224.

The Defendant also argues that the Plaintiff's case should be dismissed because it is similar to the facts in *Khowaja v. Sessions*, 893 F.3d 1010, 1012 (7th Cir. 2018). In that case, the plaintiff—who was a Special Agent in the FBI—alleged that he was fired because he was Muslim. *Id.* at 1012. In support of his claims, the plaintiff alleged that Supervisory Special Agent Green yelled phrases such as "Alhamdulillah!"—which is Arabic for "praise be to God!"—throughout the office. *Id.* at 1013. Khowaja also alleged that SSA Green used these phrases in a derogatory manner and that he had mocked Middle Eastern accents. *Id.* The defendant, by contrast, argued that the plaintiff was fired because he failed to provide *Miranda* warnings before interviewing an inmate, failed to properly coordinate with local law enforcement, disregarded his supervisors' authority, brought an untrained and unarmed intelligence analyst into a dangerous area, and otherwise demonstrated poor judgment. *Id.* at 1012–13. The plaintiff did "not dispute that any of these instances occurred." *Id.* at 1012. Thereafter, the district court granted the defendant's motion for summary judgment. *Id.* at 1014. On appeal, the plaintiff argued that he established a prima facie case of religious discrimination under the *McDonnell Douglas* framework. *Id.* The Seventh Circuit disagreed and concluded that the Plaintiff's "job performance clearly did not meet the FBI's legitimate expectations." *Id.* In relevant part, the court reasoned as followed:

> While Khowaja, as a Muslim, is a member of a protected class, and clearly suffered an adverse employment action through his termination, Khowaja's *prima facie* case is doomed by one major hurdle: his job performance clearly did not meet the FBI's legitimate expectations. . . . The record *conclusively reflects* that Khowaja had ongoing judgment-related issues throughout his employment. *Khowaja does not contest any of the instances described above and contained in the recommendation for removal report occurred*. He admits that he conducted an *un-Mirandized* interview with an inmate in custody, and that he was defensive when counseled by [his supervisor]. He also admits that he violated

9

protocol when he conducted an interview . . . without coordinating with the local police or his supervisor.

> Additionally, Khowaja does not dispute that his judgment was repeatedly cited as an issue in his performance assessments. Numerous [performance summary assessments] noted Khowaja's judgment deficiency, including one from November 2012 to January 2013, which concluded that "if his current judgment cannot improve he is unlikely to succeed in the FBI." Moreover, Khowaja's six-month [new agent assessment] rated his judgment as unacceptable, and provided a "plan of action" to address this deficiency. The recommendation for removal report cited Khowaja's lack of suitability in the judgment dimension, and his July 5, 2013, termination letter stated that his employment was terminated for failure to meet the suitability standards. *The undisputed facts show that Khowaja was not meeting the FBI's legitimate expectations, and consequently, he cannot establish a* prima facie *case of intentional discrimination or disparate treatment under the* McDonnell Douglas *framework.*
>
> . . .
>
> Setting aside the *McDonnell Douglas* framework and examining the evidence as a whole, Khowaja presents no evidence that would lead a reasonable factfinder to conclude that he was terminated, or subjected to disparate treatment, because he is Muslim. Khowaja offers no evidence of religious discrimination or animus by SSA Green or any other supervisor. True, SSA Green admitted that he inquired about Khowaja's religion during their first meeting, and that he did use Arabic phrases throughout the office given his fluency in the language. However, nothing in the record supports Khowaja's contention that SSA Green's inquiry into Khowaja's religion was demeaning, or that his use of Arabic phrases or accents was done in a derogatory manner. More importantly, Khowaja fails to demonstrate how any of SSA Green's actions constitute religious discrimination against him, or how these actions are related to his termination.

*Id.* at 1015–16 (emphasis added).

The rationale of *Khowaja* is distinguishable from the facts of this case. As noted above, the Court has already found that there is a disputed issue of material fact on whether the Plaintiff was meeting the requirements of his employment. For example, the Plaintiff stated that several individuals praised his work product and intelligence. Cetinok Dep. p. 55. He further testified that he was never questioned about failing to complete tasks nor did he ever receive a formal review regarding his job performance. *Id.* at 55–56. The Plaintiff also stated that he "was working the schedule—I mean, I was working [when] I needed to work at the time I was there." *Id.* at 39. The Plaintiff's deposition testimony also creates issues of fact regarding the drug test and whether he was "being antisocial" when he closed his office door. *Id.* at 21, 39. This is in

stark contrast to Khowaja who apparently did not contest his various workplace inadequacies. Furthermore, when viewed in the light most favorable to the nonmoving party, there is a reasonable inference that Brainard's actions were discriminatory and led to the Plaintiff's termination. Namely, the Plaintiff testified that Brainard asked him whether he accepted Jesus as his Lord and Savior and questioned him about whether Jesus was the Son of God. Cetinok Dep. p. 36. Further, the Plaintiff testified that Brainard stated that "[t]here just seems to be too many irreconcilable differences between your belief and ours." *Id.* The Plaintiff testified that Brainard's tone "was adversarial, especially his last comment . . . . It was adversarial." *Id.* at 37. Thereafter, Brainard initiated the meeting which culminated in the Plaintiff's firing. *See* Decl. of Scott Campanella ¶ 27. Accordingly, *Khowaja* is factually distinguishable and does not control the outcome of this case.

## CONCLUSION

For the reasons stated above, a reasonable jury could find that the Plaintiff was fired because of his religious beliefs. Further, there are disputes of material fact which must be resolved at trial. Therefore, the Defendant's Motion for Summary Judgment [ECF No. 62] is DENIED.

SO ORDERED on March 28, 2020.

s/ Theresa L. Springmann<br>
CHIEF JUDGE THERESA L. SPRINGMANN<br>
UNITED STATES DISTRICT COURT